**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 11-61574-CIV-ROSENBAUM/SELTZER**

ELZIE FULLER, III,

      Plaintiff,

vs.

EDWARD B. STIMPSON CO., INC.,

      Defendant.

_____/

**ORDER**

    This matter is before the Court upon Defendant's Motion for Summary Judgment [D.E. 41] and Plaintiff's Motion for Partial Summary Judgment [D.E. 43]. The Court has reviewed the Motions, all supporting and opposing filings, and the record in the case. For the reasons that follow, Defendant's Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Motion for Partial Summary Judgment is denied.

*I. INTRODUCTION*

    Plaintiff Elzie Fuller III brings claims for employment discrimination and retaliation against Defendant Edwin B. Stimpson Co., Inc., arising out of Plaintiff's long-term employment with Defendant and his subsequent termination in February 2009. D.E. 1. In his Complaint, Plaintiff alleges that he was discriminated against on account of his race, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a) (Count I), and the Florida Civil Rights Act of 1992, §760.10(1)(a), Fla. Stat. (Count III), that he was retaliated against for engaging in a protected activity under Title VII of the Civil Rights Act, 42 U.S.C. §2000e-3 (Count II), and the Florida Civil

Rights Act of 1992, § 760.10(7), Fla. Stat. (Count IV), and that he was discriminated against under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, 623(a) and Florida Civil Rights Act § 760.10, Fla. Stat. (Count V) and (Count VI).  *Id.*

Defendant moves for summary judgment against Plaintiff on all six counts.  D.E. 41.  For his part, Plaintiff seeks partial summary judgment on Counts I and III of his Complaint, which assert that Plaintiff's race was an impermissible motivating factor in Defendant's decision to terminate Plaintiff's employment in February 2009.  *See* D.E. 43.

## II. MATERIAL FACTS

### A.  Background

Defendant Edwin B. Stimpson Co. ("Stimpson") manufactures metal eyelets, grommets, snap fasteners, and hole plugs.  D.E. 42-1 at ¶ 5.  Plaintiff Elzie Fuller III ("Fuller") was employed by Stimpson as a machinist from 1970 to 2009, when he was one of eighty-six employees terminated in a mass reduction in force.  D.E. 43-2, ¶ 1.  At the time that his employment with Stimpson ended, Fuller's specific position was as a tool-and-die maker in Stimpson's tool-and-die department.  D.E. 43-2, ¶ 1.

Fuller identifies himself as being of African-American descent, and when he was terminated, he was fifty-six years old.  D.E. 47-1 at 183:1 - :20;[1] D.E. 42-1 at ¶ 15.  Over the course of his thirty-nine-year tenure with Stimpson, Fuller claims that he was passed over for several job promotions based on his age, race, or both.  D.E. 47-1 at 101:11-102:20.

---

[1]Some docket entries contain more than one page-numbering system.  Where that occurs, this Order refers to the numbering system imprinted across the top of every page by the Court's CM/ECF system, except where deposition transcripts are concerned.  For deposition transcripts, this Order refers to the original page-numbering system; the number before the colon reflects the page number and the number following the colon refers to the line number.

Stimpson counters, and the record confirms, that Fuller was hired as a Lathe Apprentice and received some promotions during his employment.  D.E. 42-1, ¶ 16; *see also* D.E. 47-1 at 103:11-106:9.  More specifically, in the mid-1970's, Fuller was promoted to a position then known as Assistant to Foreman, or Assistant Foreman.  D.E. 42-1, ¶ 16.  On May 22, 1978, he was transferred to another department, and his position changed to Tool & Die Maker C.  *Id.*  He was promoted to Tool & Die Maker B on August 9, 1993.  *Id.*  Four years later, Fuller became a Tool & Die Maker A on August 9, 1993.  *Id.*  On February 4, 2002, Fuller was promoted to Lead Person in the Tool & Die Department, but, at his own request, on August 6, 2004, he transferred back to the position of Tool & Die Maker A, although he experienced no reduction in salary.  D.E. 47-1 at 103:11-106:9; D.E. 42-1, ¶ 16.  According to Stimpson, Fuller applied for no other positions or promotions.  D.E. 42-1 at ¶ 16.  Fuller complains, however, that he was passed over on four occasions for the position of Lead Person before Charles Tarling, Fuller's Foreman at the time, offered Fuller the position in 2002.  D.E. 47-1 at 101:11 - 106:15.

**B.  The RIF**

In 2008, Stimpson experienced a steep drop in orders.  D.E. 42-1 at ¶ 6.  As a result, it concluded that it needed to lay off close to 30% of its workforce.  *Id.* at ¶ 7.  During the first week of January 2009, Stimpson began determining the employees to be laid off by evaluating the activity levels of the employees for the months of November and December 2008.  *Id.* at ¶ 10.  In a Workforce Evaluation Memorandum, Stimpson described the factors considered as follows:

> Management prepared a list for each Group that contained the general goal (30%) and suggested job classifications for reduction. Management representatives reviewed this list with first line supervisors considering each employee[']s productivity, flexibility, cross-training, reliability and attendance to develop a specific recommendation for each group.

> Senior management reviewed the overall list and submitted for legal
> review.

D.E. 42-1 at 12.

On February 2, 2009, Stimpson posted a Bulletin Board Notice to its employees explaining that a company-wide workforce reduction would be necessary because of a downturn in business and stating that employment decisions would be finalized within a few weeks.  D.E. 42-1 at 3, ¶ 11; D.E. 42-1 at 16.  At the end of the month, Stimpson terminated eighty-six of its 308 employees in a mass reduction in force ("RIF").  D.E. 42, ¶ 9.

Stimpson made the RIF terminations over the course of a three-day period beginning on Wednesday, February 25, 2009, and ending on Friday, February 27, 2009.  D.E. 42, ¶ 9.  On the morning of February 27, 2009, Stimpson informed Fuller that his employment was being terminated effective that day.  D.E. 42-1, ¶¶ 19-22.

Stimpson explained in a letter sent to the terminated employees, including Fuller, "Employees were selected for termination based on productivity, flexibility, cross training, reliability, attendance, and seniority."  D.E. 44-4.  According to Scott H. Thomas, who, at the time of the RIF, served as the executive vice president of Stimpson,[2] the foremen and the department heads of each of the respective job groupings used the criteria previously described to make recommendations regarding which employees should be terminated.  *See* D.E. 46-3 at 84:20 - 85:1.  Then, in the case of employees such as Fuller, who were in the Power Press Tool & Die group, Thomas and Stephen Karp of management reviewed the recommendations with Charles Tarling, the foreman of the group.  *See* D.E. 42-1 at ¶ 10; *id*. at 12, 17.  At that time, Thomas was 50, Karp was 59, and Tarling was 43.  D.E. 42-1 at 19-20.  All were white.

_____

[2]Thomas is now the president of Stimpson.

Following the initial selection of employees to be terminated, the list of individuals that the foremen and management decided should be terminated was provided to Jim Cuenin, an executive vice president at Stimpson, and he used the information to prepare a document called the Workforce Review spreadsheet. *See* D.E. 46-3 at 75:20-:22; *id.* at 46-3 at 84:14-85:1. The Workforce Review spreadsheet lists all employees by their department, job classification, race, gender, age, and years of service, among other information. *See* D.E. 42-1 at 19-20. In so doing, however, it groups together all employees of a certain type who are of the same race. *See* D.E. 42-1 at 19-20.

For example, all employees in the "Power Press" group, which includes those in the Power Press, Die Lathe, Grinding, and Tool & Die Departments, are listed in a three-page segment of the spreadsheet. *See* D.E. 44-2 at 9-11; D.E. 42-1 at 11. The "Power Press" listing is further subdivided according to the employees' race, so, for example, all non-clerical employees in the Power Press group who are identified by Stimpson as "black" are grouped together. *See* D.E. 44-2 at 9. The Workforce Review spreadsheet contains similar groupings for employees identified by Stimpson as "white," "Hispanic," and "Asian," respectively. *See id.* at 9-11. In addition, the spreadsheet provides information on each employee's gender, age, and years of service at Stimpson. *See id.* Finally, for each grouping by race, the spreadsheet provides a calculation of the percentage of employees of that race who were to be included in the RIF, under the heading "Go % By Race." *Id.* The percentages of employees of different racial backgrounds in the same job category as Fuller who were terminated in the RIF are as follows:

| Job Category | Black | White | Hispanic | Asian |
|---|---|---|---|---|
| Power Press Crafts Worker | 27.3% | 27.8% | 19% | 50% |

D.E. 44-2 at 9-10.

After the Workforce Review spreadsheet was prepared, Stimpson reviewed the spreadsheet "to see that [Stimpson, through the RIF, was] not adversely affecting any racial group." D.E. 46-3 at 84:3-:6; *see also* D.E. 46-3 at 84:14-19, 85:23-86:6.  Three termination decisions were changed as a result of Stimpson's review of the spreadsheet: (1) originally, a husband and wife were to be terminated, but to avoid that situation, Stimpson terminated only one of them; (2) Stimpson decided that in the accounting department, a black female who had been recommended for termination would not be terminated; and (3) in the maintenance department, Stimpson chose not to terminate a black male who had been selected for termination before review of the spreadsheet.  D.E. 46-3 at 85:2-:22.  Stimpson avers that the original decision to terminate Fuller, however, did not change. *See id.* at 85:23-86:6.  Nor was Fuller added for termination as a result of Stimpson's review of the Workforce Review spreadsheet.  *See* D.E. 46-3 at 75:20-86:6.

According to Stimpson, it selected Fuller for termination because of his attendance record. D.E. 42-1 at ¶ 27.  More specifically, Stimpson's records disclosed that Fuller was either late to work or left early on fifty-seven occasions in 2008.  *Id.*  Stimpson asserts that "[n]o other employee's attendance record compared with his in this regard."  *Id.*; *see also* D.E. 42-1 at 30-36. While Fuller retorts that all of his time off in 2008 was authorized and approved by Stimpson,[3] D.E. 47-1 at 188:14 - 191:1, Stimpson responds that the authorized or unauthorized nature of the absences was immaterial to its determination.  D.E. 49 at ¶¶ 19-24; *see also* D.E. 42-1 at ¶¶ 10, 27.  Instead,

---

[3]Fuller suggests that the time that he took off was for the purpose of attending to his ill mother and helping her to receive medical treatment before she passed away and for the purpose of making funeral arrangements after her death.  *See* D.E. 47-1 at 188:14 - 191:1.  Stimpson's records show, however, that Fuller applied for an received three days of "funeral pay" on May 22, 2007, relating to the May 13, 2007, death and the May 19, 2007, funeral of his mother.  D.E. 59-2 at 4-5.  All of these dates fall outside the 2008 period for which Stimpson stated that it reviewed employees' attendance records in deciding who to lay off.

Stimpson's analysis focused on Fuller's attendance record, no matter the nature of the absences. D.E. 49 at ¶¶ 19-24; *see also* D.E. 42-1 at ¶¶ 10, 27.  As Stimpson explains it, to function efficiently with a pared-down workforce, it was important to Stimpson to attempt to ensure that the employees remaining after the RIF would regularly appear for work on time and stay for the entire day.

Fuller challenges Stimpson's contention that he had the worst attendance record, pointing instead to Fuller's foreman Charles Tarling and Fuller's coworkers Cornelia Bularca and Jack Shuck.  D.E. 43-2 at ¶¶ 22-24.  In response, Stimpson notes that it considered attendance only during 2008, and Fuller's late arrivals and early departures that year were "materially worse than all others considered for inclusion in the RIF."  D.E. 49 at ¶ 22; D.E. 42-1 at ¶ 27; D.E. 42-1 at 30-36.  A review of the 2008 attendance statistics for Fuller, Tarling, Shuck, and Bularca reveals the following:

| Name | Left Early | Tardy |
|---|---|---|
| Fuller | 48 | 9 |
| Tarling | 4 | 1 |
| Shuck | 9 | 0 |
| Bularca | 9 | 6 |

D.E. 42-1 at 35.

With regard to age, Fuller alleges that Stimpson's offer of an early-retirement package to approximately thirty employees in late 2007 indicates that it desired to get rid of aging, long-term employees prior to the reduction in force.  D.E. 50, ¶ 5; D.E. 42-5 at 14n.18.

Fuller filed a discrimination charge with the EEOC in May 2009.  D.E. 42-1 at ¶ 17.  There is no allegation that he did not exhaust his remedies with Stimpson, the EEOC, or the Florida Commission on Human Relations.

**C. Statistical Evidence**

Prior to the reduction in force, 31.2% of Stimpson's employees were African-American, 37.7% were Caucasian, and 26.9% were Hispanic.  D.E. 43-2 at ¶¶ 37-39.  Of the eight-six employees selected by Stimpson for termination in the RIF, thirty-three of those individuals were African-American (38.4%), thirty-one were Caucasian (36.0%), and sixteen were Hispanic (18.6%).  *Id.*  Seventy of the eight-six employees terminated were over the age of forty.  D.E. 42-5, Ex. A, p. 12. The members of Stimpson's review team (Thomas, Tarning, and Karp), who made the initial RIF decisions, were all over forty years old.  D.E. 44-2.

Stimpson's expert, Dr. David P. Lamoreaux, conducted a review of the statistical evidence and concluded that the RIF did not have a significant disparate impact on African-American employees.  D.E. 42-5, ¶ 6.  Fuller's expert, Dr. N. Shirlene Pearson, however, opined that the RIF did have a disparate impact on African-American employees as compared to Hispanic employees.  D.E. 46-4.  Stimpson challenges the accuracy of Dr. Pearson's calculations, claiming that Dr. Pearson arbitrarily restricted her analysis to a partial population, and contends that the analysis did not take into consideration the actual decision-making process used by Stimpson in selecting employees for the RIF.  D.E. 42-5 at 8.  Dr. Pearson found no statistically significant evidence of age discrimination during the RIF.  D.E. 42-5 at 43.  Thus, Fuller concedes that the RIF did not have significant disparate impact on employees over the age of forty, as originally claimed in the Complaint.  D.E. 52 at 13.

**D. Hostile Work Environment Allegations**

Fuller complains that over the course of his employment with Stimpson, he was subjected to racially-charged comments and slurs by other employees, as well as to the display of racially discriminatory symbols in the workplace.  D.E. 47-1 at 97:25-100:21.  First, Fuller testified that at

some point during his thirty-nine year employment with Stimpson, he twice witnessed a piece of notebook paper with "KKK" written on it taped to his locker.  D.E. 47-1 at 97:25-98:5.  Although Fuller complained to his foreman, Hector Santos, about the first incident, D.E. 47-1 at 98:5-10, Fuller did not complain about the second occurrence.  D.E. 47-1 at 98:19-22.  Second, Fuller stated that Santos once used a racial slur when referring to Fuller.  D.E. 47-1 at 99:9-16.  Specifically, Fuller claims that another employee overheard Santos refer to Fuller when saying, "Hey man, we got to figure a way to get to get rid of that N-I-G-G-E-R."  D.E. 47-1 at 99:14-16.  Fuller did not hear the comment directly and, after being advised of the comment, Fuller did not complain about it.  D.E. 47-1 at 99:19-24.

Fuller could not pinpoint the dates of these alleged events, and Stimpson claims to have no record of any such incidents.  D.E. 47-1 at 96:14-97:3; D.E. 42-1, ¶ 25.  Instead, Stimpson contends that Fuller's personnel file contains only a single documented incident, and that documentation was apparently submitted voluntarily by Tarling, the other person involved in the incident.  *See* D.E. 42-1 at 27-28.  According to the summary authored by Tarling, a confrontation occurred between Tarling and Fuller on July 26, 1996 — thirteen years before Fuller was terminated.  D.E. 42-1, ¶¶ 24-25.  Tarling, who was serving at that time as Fuller's leadman, inquired of Fuller regarding the progress that he was making on his work.  D.E. 42-1 at 27-28.  Fuller took offense to the inquiry and, in response, Fuller accused Tarling of checking up on Fuller because of his race.  D.E. 42-1, ¶ 24; D.E. 42-1 at 27-28.  Tarling responded to Fuller's accusation, stating that Tarling's job required him to check the work progress of all employees under his lead every day.  *Id.*  Fuller replied that he had been employed with Stimpson for twenty-five years at that time, and "he should not need to be checked on."  *Id.*

In addition to these incidents, Fuller claims to have witnessed a racially charged symbol in

the workplace on the day that Stimpson terminated his employment.  Specifically, on the morning of February 27, 2009, Fuller observed two black shoelaces in the shape of "nooses" hanging on a pillar near his workspace.  D.E. 46-1 at 55:13-56:21.  Fuller took a photograph of the display.  D.E. 46-1 at 63:15-23.[4]  Fuller claims that he discussed the upsetting display with Tarling and advised him that he would need to go home early.  D.E. 46-1 at 1-25.  Shortly after Fuller complained about the nooses, he was told that he needed to go to the office, where Stimpson advised him that his employment was being terminated.   D.E. 47-1 at 192:11-193:9.  Fuller estimates that twenty minutes elapsed between when he complained to Tarling about the nooses and when Fuller was summoned to the office for termination.  D.E. 46-1 at 196:11-15.  Despite Fuller's assertion to the contrary, Tarling claims that he did not remember being made aware of the noose display on the morning of February 27th, but that, at some point, the "noose" or "hangman's knot" display was brought to his attention.  D.E. 42-3 at 61:9-62:5.

### III. SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee*

---

[4]Stimpson employee Cleavon Douglas testified that he also saw the "nooses" on the morning that Fuller's employment was terminated and that he also took a photograph of the display.  D.E. 46-2 at 23:12-25:25; D.E. 44-5.

*Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment.

-11-

*Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### *IV. ANALYSIS*

**A.  Plaintiff's Claims of Race Discrimination (Counts I and III)**

#### 1.      Race-Based Claims Based on Termination

In Counts I and III, Fuller alleges that Stimpson intentionally discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a) ("Title VII"), and the Florida Civil Rights Act of 1992, §760.10(1)(a), Fla. Stat. ("FCRA").[5]   More specifically, Fuller alleges that Stimpson discriminated against him by including him in the RIF and ultimately discharging him on February 27, 2009.[6]

Title VII provides that an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269,

---

[5]The same analysis is used to evaluate race discrimination claims brought under Title VII and the FCRA because the FCRA was patterned after Title VII.  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

[6]Although Stimpson sets forth an argument in its Motion for Summary Judgment addressing any potential claims for disparate-impact race discrimination, a review of the Complaint reveals that Fuller does not assert a disparate-impact claim based upon race.  Unlike in Count VI, where Fuller sets forth a count for "Disparate Impact Resulting in Discrimination Because of Age," no separate count is alleged on the basis of race.  Instead, in Counts I and III, Fuller  alleges only intentional discrimination based on his race.  Nor, in his Response to Defendant's Motion for Summary Judgment does Fuller advance any argument that he intended to bring a claim for disparate impact based on race.  Fuller's own summary judgment motion likewise includes no mention of a disparate-impact claim based upon race.

1274 (11th Cir. 2008) (citation omitted).

Direct evidence of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citation and internal quotation marks omitted); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). Such direct evidence reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee" and indicates that the adverse employment decision was motivated by the decision-maker's intent to discriminate. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)). As a result, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence of discrimination." *Kilpatrick v. Tyson Foods, Inc.*, 268 F. App'x 860, 862 (11th Cir. 2008). If the evidence merely suggests, but does not prove, a discriminatory motive, it is not direct evidence. *Wilson*, 376 F.3d at 1086. If direct evidence of discrimination is presented, the defendant must "prove by a preponderance of the evidence that it would have taken the adverse employment action even in the absence of discrimination." *Cooper v. S. Co.*, 260 F. Supp. 2d 1295, 1299 (N.D. Ga. 2003) *aff'd*, 390 F.3d 695 (11th Cir. 2004); *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985).

Here, the record contains no direct evidence of race discrimination. Fuller has not come forward with any statements made by the decision makers involved in the RIF that show that they included Fuller in the RIF because of his race. Fuller points to his then-foreman Santos's alleged remark made nearly twenty years ago: "Hey man, we got to figure a way to get to get rid of that N-I-G-G-E-R." But this remark, as deplorable as it is if it was made, does not constitute direct evidence of Stimpson's intent to discriminate. First, and most significantly, the alleged statement was not

made by Karp, Tarling, or Thomas — the individuals who decided to include Fuller in the RIF. Second, the alleged statement was made in the 1990s — approximately twenty years prior to Fuller's termination. Consequently, the comment could not fairly be attributed to Stimpson's decision to terminate Fuller. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998) (remarks by non-decision makers or remarks unrelated to the decision-making process are not direct evidence of discrimination).

In the absence of direct evidence of race discrimination, the Court turns to whether Fuller can establish his race-discrimination claims through circumstantial evidence. Evidence that indicates, but does not definitively prove, an employer's discriminatory motive is deemed circumstantial. A claim based on circumstantial evidence is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, a plaintiff must show that (1) he is a member of a protected class, (2) he was subject to an adverse employment action, (3) his employer treated similarly situated employees who were not members of his class more favorably, and (4) he was qualified for the job or benefit at issue. *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 887 (11th Cir. 2005). In situations involving "a reduction in force, a modified *prima facie* formulation may apply, which allows a case of discrimination to be established by presenting evidence showing, not dissimilar treatment, but that the employer intended to discriminate against the plaintiff on the basis of . . . race." *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 870 (11th Cir. 2011); *See also Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). To establish intent, a plaintiff must proffer evidence that the defendant (1) consciously refused to consider retaining the plaintiff because of his race or (2) regarded race as a negative factor in the retention consideration. *Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966,

-14-

971 (11th Cir. 2008).

If the plaintiff establishes a prima facie case, the employer then bears the burden of producing evidence demonstrating a legitimate and non-discriminatory reason for the employment action. *Wilson,* 376 F.3d at 1087. If a defendant meets this burden of production, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to establish that the proffered non-discriminatory reason offered by the defendant was a pretext for discrimination. *Id.* "However, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). If a Plaintiff puts forth sufficient circumstantial evidence creating an issue of fact as to the employer's discriminatory intent, summary judgment will always be avoided. *Id*; *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (finding that the circumstantial evidence necessary to establish a Title VII case of discrimination is "flexible and depends on the particular situation").

Here, the parties do not dispute that Fuller is a member of a protected class and that he suffered an adverse employment action. Nor does there appear to be a dispute that Fuller was qualified for his job. Stimpson argues, however, that Fuller has not established the third element of his *prima facie* case because he has not provided evidence that Stimpson treated other similarly situated individuals who were not members of his class more favorably. Fuller's lack of a comparator, however, is not fatal to his race-discrimination claim, as long as Fuller can produce other circumstantial evidence that would support an inference of the employer's racially discriminatory intent. *See Lockheed-Martin Corp.*, 644 F.3d at 1327-28 (citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008). As noted, because this matter involves a reduction

in force, the elements of a *prima facie* case are modified, allowing Fuller to establish his claim by showing his employer's intent to discriminate on the basis of race, rather than by identifying a similarly situated employee who was treated more favorably.  *See Vega,* 432 F. App'x at 870.

The record reveals that Fuller has set forth evidence that could lead a reasonable jury to believe that Stimpson acted with discriminatory intent when conducting its RIF.  Stimpson created the Workforce Review spreadsheet to aid the company in its decisions concerning the RIF.  When creating the Workforce Review spreadsheet, Stimpson categorized employees on the basis of race, along with other characteristics.  For instance, the "Power Press" listing, which Fuller is a part of, is subdivided according to the employees' race, so, for example, all non-clerical employees in the Power Press group and identified by Stimpson as "black" are grouped together.  The Workforce Review spreadsheet contains similar groupings for employees identified by Stimpson as "white," "Hispanic," and "Asian," respectively.  In addition, for each grouping by race, the spreadsheet provides a calculation of the percentage of employees of that race that were to be included in the RIF, under the heading "Go % By Race."  Accordingly, the Workforce Review spreadsheet could lead a reasonable juror to conclude that Stimpson made race a factor in its decision-making process.

Moreover, the testimony of Stimpson's President, Scott Thomas, corroborates this conclusion.  During his deposition, Thomas confirmed that Stimpson employed the Workforce Review spreadsheet to racially balance the termination decisions, and some initial termination decisions were changed on that basis.  The Court recognizes that Stimpson claims that its intent was not discriminatory and that it consulted the Workforce Review spreadsheet only after termination decisions were made and for the purpose of ensuring that no group would be adversely affected. The fact remains, however, that Stimpson admits to categorizing its employees by race in connection with the RIF, and it further concedes that it changed some termination decisions on that basis.  In

light of these facts, whether Stimpson impermissibly made employment decisions on the basis of race — that is, whether Stimpson consciously refused to consider retaining Plaintiff because of his race or regarded race as a negative factor in the retention consideration — involves a credibility determination to be made by a jury, not this Court.  Taking the facts in the light most favorable to Fuller, the Workforce Review spreadsheet and its utilization by Stimpson in the RIF decision-making process creates a sufficient basis for supporting an inference of discriminatory intent.

Because the record is sufficient to create a genuine issue of fact concerning whether Stimpson intended to discriminate on the basis of race when it conducted its RIF, the burden shifts to Stimpson to rebut the inference of discrimination.  Here, as its legitimate business reason for terminating Fuller, Stimpson contends that the dire economic situation in 2009 and sharp decline in Stimpson's sales necessitated the RIF.  Stimpson also points to Fuller's unsatisfactory attendance record as the reason that he was selected for inclusion in the RIF.  These reasons satisfy the employer's burden of production.  *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013) (employer articulated a legitimate non-discriminatory reason for including plaintiff in reduction-in-force); *Mitchell v. City of LaFayette*, 504 F. App'x 867, 870 (11th Cir. 2013) (eliminating a position to avoid unnecessary expenditure may be a legitimate, non-discriminatory reason for an employment decision); *see also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).  Because Stimpson has met its burden of providing a legitimate, non-discriminatory reason for its actions, under the *McDonnell Douglas* framework, the burden shifts back to Fuller to show that Stimpson's reasons are merely pretextual.

A plaintiff may show pretext either directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing that the employer's

proffered reasons are unworthy of credence. *Castillo v. Roche Lab., Inc.*, 4678 F. App'x 859, 863 (11th Cir. 2012). In the end, the analysis requires determination of whether a discriminatory animus motivated the employer. *Id.*

For the reasons previously discussed, the Court finds that a genuine dispute exists as to whether Stimpson's proffered reasons for including Fuller in the RIF are pretextual. *See Wilson*, 376 F.3d at 1087 (evidence of pretext may include the same evidence offered initially to establish a *prima facie* case). Although Stimpson avers that race was not the reason that Fuller was included in the RIF, the evidence shows that Stimpson categorized its employees within each department and job classification by their respective races in the Workforce Review spreadsheet. It is also undisputed that Stimpson, at some point, consulted this chart in making certain termination decisions. What is not clear, and what a jury must determine, is whether Stimpson's explanation that it consulted the Workforce Review spreadsheet only after it made its decision to include Fuller in the RIF is credible. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge deciding a motion for summary judgment. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)(citation omitted).

Significantly, the Workforce Review spreadsheet does not list Fuller with all other members of the Power Press department, nor with all of his co-workers who are tool and die makers. Instead, the Workforce Review Spreadsheet places Fuller in a group with other employees who are African-American. White employees and Hispanic employees are similarly grouped together on the Workforce Review spreadsheet. A reasonable juror could find that Stimpson's classification of its employees by race evidences that race was a motivating factor with respect to termination if that juror does not find credible Stimpson's explanation for the spreadsheets.

Also significant is the fact that Stimpson claims to have based its termination decisions, at least in part, on seniority. The record reflects, however, that with approximately thirty-nine years of service, Fuller was one of the most senior employees working at Stimpson. Ultimately, when viewing the evidence in the light most favorable to Fuller, a jury question exists regarding Stimpson's motives in including Fuller in the RIF. Accordingly, summary judgment is denied with respect to Fuller's claims that Stimpson terminated his employment due to his race.[7]

**2.     Failure to Promote**

While the Complaint mentions that Fuller was passed over for promotion during his employment, it is unclear whether Fuller attempts to bring a race-discrimination claim on this ground. Counts I and III assert that Stimpson discriminated against Fuller based on his race by including him in the RIF and also allege that Fuller was subjected to a racially hostile work environment. But the Counts do not specifically allege a disparate-treatment claim based on a failure to promote. Nor does Fuller's response to Stimpson's Motion for Summary Judgment address any claim for failure to promote. Likewise, Fuller's own Motion for Partial Summary Judgment seeks judgment with respect to Counts I and III, but refers only to Stimpson's decision to terminate Fuller as the basis for the race discrimination claims. The Court could identify only one sentence of the Complaint — Paragraph 25 of the general allegations of the Complaint — that

---

[7]Although the Court recognizes that Fuller also seeks to use statistics to show that Stimpson's reasons for including him in the RIF are pretextual, a question exists as to whether the information sought to be relied upon reveals statistically significant evidence. As set forth more fully in Stimpson's pending Motion *in Limine*, Stimpson contends that Dr. Pearson's analysis does not reflect the actual decision-making process used by Stimpson and improperly compares employees who were not similarly at risk of selection for the RIF. *See* D.E. 60. The Court need not determine this issue at this juncture because it finds that the record contains other evidence of pretext that raises an issue of fact as to whether Stimpson intentionally discriminated against Fuller when it included him in the RIF.

mentions Plaintiff's general belief that he was passed over for promotion.  Counts I and III, however, do not allege that Stimpson's alleged failure to promote Fuller is a basis for his race-discrimination claims.

Even assuming that Fuller intended to set forth a claim for failure to promote, any such claim would be time-barred.  The only allegation that Fuller makes about being denied a promotion refers to when Stimpson allegedly passed Fuller over for the position of leadman before ultimately awarding him the position in approximately 2002.  Fuller later requested a transfer out of the position in 2004.  D.E. 47-1 at 101:11-106:15.  Because Fuller did not file his charge of discrimination with the EEOC until May 2009, any failure-to-promote claim advanced by Fuller is time barred.

To timely pursue a Title VII claim, the aggrieved party must file a charge with the EEOC within 180 days of the alleged discriminatory act.  42 U.S.C. § 2000e-5(e)(1).  The filing period is extended to 300 days if the aggrieved party first files a complaint with a state agency.  § 2000e-5(e)(1).  "For a charge to be timely in a deferral state such as Florida, it must be filed within 300 days of the last discriminatory act."  *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002).  Only those discriminatory practices that occur within the 300-day period prior to the EEOC filing are actionable.  *Id.*  If a charge is not filed with the EEOC within the time limits prescribed by the Statute, the claim is barred.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).  Similarly, an employment discrimination claim filed under the Florida Civil Rights Act must be filed within 365 days of the discriminatory act to be actionable.  Fla. Stat. § 760.11(1).

Even if Fuller's claims were not time barred, his bare allegations of discriminatory failure to promote, without more, are not enough to create a genuine issue of material fact to survive summary judgment.  Accordingly, to the extent that Fuller makes such a claim, summary judgment

must be granted on it.

**B.  Plaintiff's Hostile Work Environment Claim (Counts I and III)**

In Counts I and III of the Complaint, Fuller also asserts that Stimpson violated Title VII and the FCRA by subjecting him to a racially hostile work environment.  According to Fuller, the environment was so humiliating and intimidating that it reasonably interfered with his ability to perform his job.

To succeed on a hostile-work-environment claim, a plaintiff must establish that (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citation omitted).  With regard to the fourth requirement, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Mack v. ST Mobile Aerospace Eng'g, Inc.*, 195 F. App'x 829, 833 (11th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Miller*, 277 F.3d at 1275.

Stimpson argues that Fuller has failed to meet the fourth element of his *Prima facie* case because he has presented no evidence that the conduct complained of was severe or pervasive enough to constitute a hostile work environment.  The inquiry regarding the fourth element has both a subjective and objective component.  "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment and this subjective perception must be objectively reasonable." *Mack*, 195 F. App'x at 834 (quoting *Harris*,

510 U.S. at 21).  To be actionable, the behavior must result in both "an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive." *Miller*, 277 F.3d at 1276 (quoting *Harris*, 510 U.S. at 21-22).

With regard to the objective severity of the alleged harassment, the inquiry is fact intensive, with the court considering four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Mack*, 195 F. App'x at 834 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)); *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris,* 510 U.S. at 23)).

 Hostile-work-environment claims are different from discrete discriminatory acts because they "are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  Thus, such claims can be actionable even if each individual act, on its own, would not be.  *Id.*  For purposes of timeliness, each component of a hostile-work-environment claim need not have occurred within the statutory period.  *Id.* at 117.  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.* Accordingly, an evaluation of a hostile-work-environment claim must take into account the totality of the circumstances.  *Id.* at 116.

In this case, even viewing the facts in a light most favorable to Fuller, reasonable jurors could not conclude that Fuller suffered severe and pervasive harassment sufficient to alter the terms and conditions of his employment.  Consequently, summary judgment must be entered in favor of Stimpson with respect to Fuller's hostile-work-environment claims.

Fuller bases his hostile work environment claim on four incidents that allegedly occurred over the course of his thirty-nine year employment with the Stimpson.  Specifically, Fuller points to (1) the placement of a piece of notebook paper on his locker with "KKK" written on it; (2) the fact that a co-worker told Fuller that Santos used a racial slur when referring to Fuller; (3) the incident in which Tarling asked Fuller about his work progress on a particular job; and (4) the black shoelace nooses that were found hanging near Fuller's work station on the morning of his termination.

First, the record is completely devoid of any evidence that would suggest that the incident between the Fuller and Tarling was racially motivated.  The evidence shows merely that Tarling — a supervisor — was attempting to oversee a project upon which Fuller, who was under Tarling's supervision, was working at the time.  Tarling did not use any racial slurs or otherwise indicate that he was checking up on Fuller's work progress for racially motivated reasons.  Indeed, it was Tarling's job as a supervisor to keep abreast of his team members' work.  Aside from Fuller's own subjective belief that Tarling was acting with racial animus, no evidence exists to support Fuller's belief that the incident was racially motivated.  An objectively reasonable person in Fuller's position would not find Tarling's actions to be racially harassing and, consequently, this incident may not be considered when determining whether a hostile work environment existed.

Next, a co-worker told Fuller that he overheard Santos refer to Fuller when Santos allegedly said, "Hey man, we got figure a way to get to get rid of that N-I-G-G-E-R."  Without question, there is no place within or outside the workplace where this type of deplorable language or sentiment is acceptable.  But Santos's alleged comment was not directed to Fuller, and Fuller did not hear the comment.  Rather, another employee told Fuller that he heard Santos refer to him in this manner. As a result, the comment constitutes hearsay.

The last two events, the display of the letters "KKK" on a piece of notebook paper on Fuller's locker and the two black shoelace nooses hanging near his workspace, involved racially charged symbols. Obviously, such racially charged symbols are disgusting and must not be tolerated.

But even including Santos's alleged comment, that leaves three racially deplorable incidents occurring over Fuller's thirty-nine year employment. These incidents did not occur in close temporal proximity to one another. And, while Fuller was unable to specify the dates of some of the incidents, two of the three incidents occurred during the 1990s — approximately twenty years ago. In contrast, the last incident complained of happened in 2009.

Although no magic number exists to enable a plaintiff to establish the harassment necessary to a hostile-work-environment claim, it is the "repeated incidents of [ ] harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." *Miller*, 277 F.3d at 1276 (internal quotations and citations omitted). Here, Fuller was employed by Stimpson for a period of thirty-nine years, and at best, the three alleged incidents spanned the course of twenty years. While the Court condemns the extremely offensive nature of these incidents and finds them to be completely unacceptable, the record does not evidence the type of concentrated harassment necessary to sustain a hostile-work-environment claim under this Circuit's precedent.

In *Mack v. ST Mobile Aerospace Engineering*, for example, the Eleventh Circuit found that frequent and repeated conduct, including noose and KKK sign displays, like those in this case, constituted sufficient evidence to support a hostile-work-environment claim. *Mack*, 195 F. App'x at 834-38. The key difference between *Mack* and this case, however, is the sheer volume and frequency of the conduct. In *Mack*, the plaintiffs were repeatedly exposed to nooses (seven noose displays in a two-year period), racial graffiti (swastikas, "KKK", "nigger," and other slurs written

repeatedly on bathroom walls), racially derogatory remarks (directed at the plaintiffs multiple times), and confederate flags on t-shirts, bumper stickers, tool boxes, and tattoos permeated the workplace. *Id.* at 834-837. In *Mack*, the Court found that, based on the totality of the circumstances, the plaintiffs produced sufficient evidence to create an issue of fact as to whether the plaintiffs were subjected to a racially hostile work environment. *Id.* at 837. In particular, the Court deemed the conduct to be frequent, severe, physically threatening, and humiliating. *Id.* And it noted that the plaintiffs had complained about the conduct on multiple occasions and that the conduct had prevented the plaintiffs from effectively performing their jobs.

Here, in contrast, Fuller sets forth three discrete harassing incidents over an approximate twenty-year period. One of these incidents — Santos's alleged comment — Fuller did not experience first-hand. These infrequent incidents, taken together over the course of Fuller's long-term employment with Stimpson would not lead fair-minded jurors to conclude that Fuller suffered severe and pervasive harassment sufficient to alter the terms or conditions of his employment, as that standard is construed in this Circuit. *See e.g., Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 585-86 (11th Cir. 2000); *Mendoza*, 195 F.3d at 1247. Additionally, unlike in *Mack*, no evidence exists that Fuller felt physically threatened by the symbols. In fact, one of Fuller's co-workers who is also African-American and witnessed the nooses indicated that he did not find the display to be physically threatening and instead stated that he and Fuller "started laughing" about the nooses. *See* D.E. 46-2 at 10; Douglas depo at 25:18-23. Finally, the evidence does not suggest that the alleged harassment prevented Fuller from performing his job.

Because Fuller cannot establish the fourth element of his *prima facie* case, he cannot prevail on his hostile-work-environment claim. Consequently, it is unnecessary for the Court to evaluate whether Stimpson could be held vicariously liable for the alleged conduct. Summary judgment is

granted in favor of Defendant with respect to Plaintiff's hostile-work-environment claim.

## C. Plaintiff's Retaliation Claim (Counts II and IV)

In Counts II and IV, Fuller asserts that Stimpson retaliated against him in violation of Title VII and the FCRA because Fuller opposed practices made unlawful under those acts when he complained to Stimpson regarding "racist remarks, symbols, and harassment."  Specifically, Fuller points to the events of February 27, 2009, during which he observed two black nooses hanging near his work station.  Fuller claims that Stimpson retaliated against him by terminating his employment on the same morning that he complained about the nooses.

Title VII's anti-retaliation provision states, in relevant part, that it is unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  To state a claim for retaliation under Title VII, an employee must prove that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relation between the two events.  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).[8] Recently, the Supreme Court announced that Title VII retaliation claims require proof that the desire to retaliate was the "but-for" cause of the challenged employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2528 (June 24, 2013).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* at 2533.

---

[8]The same analysis is used to evaluate retaliation claims brought under Title VII and the FCRA.  *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).

Here, Fuller claims that he complained to his supervisor, Mr. Tarling, about the two nooses that he saw on the morning of February 27, 2009, and approximately twenty minutes later, Stimpson terminated Fuller's employment.  It is clear that Fuller has met the second prong of the *prima facie* case — he suffered an adverse employment action when he was terminated.  Stimpson, however, contends that Fuller cannot meet the first and third prongs of the *prima facie* case because he cannot show that he engaged in protected activity and because he cannot establish a causal connection between his complaint and his termination.  Fuller does not address the arguments raised by Stimpson in its Motion for Summary Judgment with respect to his retaliation claim.  Although this lack of argument could be construed as a concession, the Court will, nonetheless, review Fuller's retaliation claim.

Even assuming that Fuller can establish that he engaged in protected activity, Fuller fails to produce evidence from which a reasonable jury could find a causal connection between his complaint about the two nooses and his termination.  While close temporal proximity between the adverse employment action and the protected activity could be sufficient on its own to demonstrate a causal connection, *see Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007), "[t]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision-maker did not have knowledge that the employee engaged in protected conduct." *Walton-Horton v. Hyundai of Ala.*, 402 F. App'x 405, 409 (11th Cir. 2010) (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

The record in this case indicates that the termination decisions with respect to the RIF had already been made at the time that Fuller complained about the noose display.  Significantly, an internal Stimpson e-mail establishes that the decision to include Fuller in the RIF was finalized, at

the latest, by February 24, 2009, whereas Fuller complained about the nooses three days later — on February 27, 2009. *See* D.E. 42-1 at 22. Consequently, Fuller cannot establish the requisite causal connection. Additionally, a question exists as to whether Stimpson decision makers were even aware of Fuller's complaint prior to his termination because Tarling stated that he did not recall Fuller's complaint. And, even if Stimpson had been aware of Fuller's complaint, employers need not suspend previously planned adverse employment actions upon discovering protected activity. *See Walton-Horton*, 402 F. App'x at 409.

Moreover, the circumstances surrounding Fuller's termination further support the conclusion that Stimpson did not retaliate against Fuller. Significantly, Stimpson terminated Fuller along with a group of approximately thirty other employees on the morning of February 27, 2009. The terminations were expected because Stimpson informed its employees in early February 2009 that a reduction in force would take place by the end of the month. The fact that Stimpson was not the only employee terminated and, in fact, thirty other individuals were terminated on the same day strongly suggests that Fuller's inclusion in the RIF was not related to his complaint about the noose display. Finally, during his deposition, Fuller himself indicated that he did not believe that his termination on February 27, 2009, was related to his conversation with Tarling that same morning. *See* D.E. 47-1 at 117:9-118:5.

Overall, Fuller cannot show that Stimpson terminated him because he complained about the black nooses found near his work station. Consequently, Stimpson is entitled to summary judgment with respect to Fuller's retaliation claims — Counts II and IV.

**D. Plaintiff's Age Discrimination Claims (Counts V and VI)**

**1.      Disparate Treatment Claim**

In Count V of the Complaint, Fuller asserts claims under the Age Discrimination in

Employment Act ("ADEA") and the FCRA, contending that Stimpson included him in the RIF and ultimately terminated him because of his age.

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *see also Mitchell v. City of LaFayette*, 12-12556, 2013 WL 310063, at *1 (11th Cir. Jan. 28, 2013) ("The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age."). In *Gross*, the Supreme Court announced that in order for a plaintiff to establish a disparate-treatment claim under ADEA, the plaintiff must prove that age was the "but-for" cause of the employer's adverse decision. *Gross*, 557 U.S. at 176. In other words, a plaintiff must show that his age was the reason that the employer decided to act. *Id*. At all times, the plaintiff retains the burden of persuasion to establish that age was the cause of the employer's adverse action. *Id*. at 177. The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even if the plaintiff has come forth with some evidence that age was one motivating factor. *Id*. at 180. Since *Gross*, the Eleventh Circuit has reviewed age-discrimination claims under both the *McDonnell Douglas* and *Gross* standards. *Mitchell*, 2013 WL 310063, at *1.

As with a race-based disparate treatment case, the prima facie showing in an ADEA disparate-treatment case is modified when the termination resulted from a reduction in force. Where a RIF is involved, the plaintiff must show that (1) he was in a protected age group; (2) he was adversely affected by an employment decision; (3) he was qualified for his current position or to assume another position at the time of discharge; and (4) the evidence could lead a factfinder

reasonably to conclude that the employer intended to discriminate on the basis of age.  *Id.* at *2. With respect to the last prong, the plaintiff must produce evidence that his employer did not treat him neutrally with respect to his age, but, rather, discriminated against him based upon it.

Fuller has failed to meet the last prong of his *prima facie* case because he has not produced any evidence that could lead a factfinder reasonably to conclude that Stimpson intended to discriminate on the basis of Fuller's age.  In support of his claim, Fuller first notes that he was the only tool-and-die maker terminated and, at fifty-six, he was older than the employees retained in that section.  According to Fuller, the employees retained were Jack Shuck, age fifty-two, Cleavon Douglas, age thirty-six, and Juan Fajardo, age twenty-one.  Perhaps this fact would suggest discrimination were it not for the fact that even Fuller's own expert, Pearson, found no statistically significant evidence of age discrimination.  In other words, while Fuller may have been the oldest of the four tool-and-die makers considered, plenty of older employees were retained while many younger ones were terminated.

In further support of his claim that Stimpson was motivated to reduce the number of older employees, Fuller points to an effort by Stimpson in late 2007 to offer an early-retirement incentive to employees over the age of fifty.  Offering an early retirement package, however, is not necessarily evidence of Stimpson's intent to discriminate based on age.

And even if Fuller could establish a *prima facie* case, he has not shown that "but-for" his age, he would not have been terminated as a result of the RIF.  First, it is undisputed that the reason Stimpson implemented the RIF was the economic downturn and sharp decline in orders.  Second, Stimpson avers that it included Fuller in the RIF because of his poor attendance record the year prior to the RIF.  According to Stimpson, it took into consideration its employees' attendance record for 2008 because greater dependability in a smaller workforce after the RIF would be important.  The

record appears to support Stimpson's explanation because no other employee left early or was tardy to work anywhere near as often as Fuller.  Significantly, Fuller had fifty-seven instances of tardies and early departures in 2008.  The next closest employee to whom Fuller points had fifteen.  Third, while not determinative, it is worth noting that the Review Team that made the decision to include Fuller in the RIF was comprised of individuals who were all over the age of forty.  Specifically, the Review Team was made up of Thomas, who was fifty years old, Karp, who was fifty-nine years old, and Tarling, who was forty-three years old.  *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("[Plaintiff] faces a difficult burden here, because all of the [decision makers] . . . were well over forty and within the class of persons protected by the ADEA. [They] are more likely to be the victim of age discrimination than its perpetrators").

Put simply, the record is insufficient for Fuller to demonstrate that his age was the "but-for reason that he was terminated.  And, even under the *McDonnell Douglas* burden-shifting analysis, Fuller cannot demonstrate that Stimpson's legitimate reasons for including him in the RIF were pretextual and that the real reason for his termination was his age.  For these reasons, Stimpson is entitled to summary judgment with respect to Count V — his age-discrimination claim.

### 2.    Disparate Impact Claim

In Count VI of the Complaint, Fuller asserts a disparate-impact claim based on alleged age discrimination.  Fuller alleges that Stimpson violated the ADEA when it applied  facially neutral criteria and practices to select individuals for termination in the RIF, which disparately affected employees, including Fuller, who were over the age of forty.

In responding to Stimpson's Motion for Summary Judgment, Fuller concedes that there is an absence of statistical evidence indicating that employees over forty were disparately impacted by the RIF.  *See* D.E. 52 at 13.  Significantly, Fuller agrees that Stimpson is entitled to summary

judgment on Fuller's disparate-impact age-discrimination claim.  *See* D.E. 52 at 16.  In light of these

facts, Stimpson's Motion for Summary Judgment is granted with respect to Count VI.

### E.     Plaintiff's Motion For Partial Summary Judgment

Fuller filed a Motion for Partial Summary Judgment with respect to Counts I and III of the

Complaint — the counts alleging intentional discrimination based upon race.  For the reasons

expressed in Section IV.A.1., *supra*, a genuine issue of material fact exists with respect to whether

Fuller's race motivated Stimpson to include him in the RIF.  Contrary to Fuller's assertion, the mere

fact that Stimpson created the Workforce Review spreadsheet, in which it classified its employees

by race, is not definitive evidence of its intent to discriminate against Fuller.  According to

Stimpson, the chart was not used at all with respect to its decision to terminate Fuller.  Instead,

Stimpson asserts that it was Fuller's poor attendance record that caused Stimpson to include him

in the RIF.  Moreover, Stimpson emphasizes that it made its decision to terminate Fuller prior to its

analysis of the Workforce Review spreadsheet.  Finally, Stimpson contends that although it changed

its decision to terminate in a few instances, none of these involved Fuller.  Overall, Stimpson claims

that the spreadsheet was used to make sure that Stimpson, through the RIF, was not adversely

affecting any racial group.  Because a reasonable jury could find that Stimpson's explanation is

credible and does not involve discriminatory intent, Fuller's Motion for Partial Summary Judge is

denied.

### *V. CONCLUSION*

For the foregoing reasons, Defendant's Motion for Summary Judgment [D.E. 41] is

**GRANTED IN PART AND DENIED IN PART.**  Summary Judgment is granted in favor of

Defendant on Counts II, IV, V, and VI, and with respect to the hostile-work-environment claims set

forth in Counts I and III.  Plaintiff's claims that Defendant discriminated against him by including

him in the RIF, as set forth in Counts I and III will proceed.  Plaintiff's Motion for Partial Summary

Judgment [D.E. 43] is **DENIED** for the reasons set forth herein.  The Court **DEFERS RULING** on

the pending Motions in Limine.  [D.E. 60, 61].

       **DONE and ORDERED** in Fort Lauderdale, Florida, this 30th day of August 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of record

-33-